Dallin B. Holt (Utah Bar No. 18210)
FRAZIER LAW, PLLC
222 S. Main Street, 5th Floor
Salt Lake City, Utah 84101
Telephone: (480) 691-0975
dholt@frazierlawpllc.net

*Attorneys for Plaintiff Voter Reference Foundation, LLC*
(Additional counsel listed in signature block)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,**<br><br>Plaintiff,<br>v.<br><br>**DEIDRE M. HENDERSON**, in her official capacity as the Lieutenant Governor of Utah,<br><br>Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Case Number: ________________**<br>**Judge: ________________** |

**COMES NOW** Plaintiff Voter Reference Foundation, LLC ("VRF"), by and through undersigned counsel, and for its Complaint against the Honorable Deidre M. Henderson, in her official capacity as the Lieutenant Governor of Utah ("Lieutenant Governor"), states and alleges as follows:

1. VRF is a nonprofit organization dedicated to increasing voter participation in elections while protecting election integrity. In service of those goals, VRF engages in political speech regarding states' maintenance of accurate voter rolls.

2. Specifically, VRF requests, analyzes, and publishes the official statewide voter list of each state.

3. Under the Help America Vote Act ("HAVA"), "each State, acting through the chief State election official" must implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State . . . ." 52 U.S.C. § 21083(a)(1)(A).

4. Under the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.* (the "NVRA") and, specifically its "Public Disclosure Provision," 52 U.S.C. § 20507(i)(1), each state must make its official statewide voter list publicly available.

5. Public disclosure and inspection of statewide voter lists is the only way for the public to determine how and whether officials are maintaining accurate voter rolls.

6. VRF's election professionals and database administrators analyze the data to identify potential inaccuracies, such as discrepancies between the number of individuals registered to vote and the number with a credit for having voted in a particular election. It not only makes these findings publicly available, but it engages in dialogue with states where discrepancies are identified. This helps officials to remedy any issue in the state's voter list maintenance. Even if there are no issues with list maintenance, identifying and explaining the discrepancies helps build an audit trail so that the public can understand how and why the discrepancies came to exist, ultimately building public confidence in the administration of elections and, in turn, increasing voter participation.

7. VRF also engages in political speech on its online forums, including VoterReferenceFoundation.com and VoteRef.com, to inform the public regarding voter list maintenance across the country. It makes available to the public the same official voter rolls it obtains from the states under the NVRA at VoteRef.com (the "Website") so that interested citizens in Utah and other states can search public voting records, provided they first agree to VRF's terms of service.

8. The first step to undertaking these activities in each state is to request and obtain that state's official state voter list.

9. As it has done in dozens of other states, VRF requested Utah's official state voter list—that is, a copy of the official statewide voter list and associated voting-history data—from the Lieutenant Governor under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1).

10. As described in detail below, VRF made multiple requests under the NVRA's Public Disclosure Provision to the Lieutenant Governor, seeking three sets of voter records: (1) a copy of the public and private versions of Utah's official statewide voter list (including year of birth, but omitting any voter's social security number, driver's license number, telephone number, and/or email address); (2) data for voters removed or canceled from any voter list since February 19, 2024; and (3) voting history/credit data for the November 8, 2022 and November 5, 2024 general elections.

11. VRF informed the Lieutenant Governor that it intended both to publish Utah's statewide voter list on the Website and to conduct and publish a discrepancy analysis of Utah's rolls.

12. In doing so, VRF's request took issue with the position previously taken by the Lieutenant Governor that any requested records could only be used *by the requestor*, meaning that the records could not be shared or discussed with others.

13. The Lieutenant Governor has not disputed that the NVRA requires Utah to make the official statewide voter list available.

14. Nevertheless, after a prolonged series of correspondence between VRF and the Lieutenant Governor's Office, she did not make (and to date, has not made) the requested records, including the official statewide voter list, available in the form in which VRF is entitled to receive it.

15. Instead, the Lieutenant Governor's Office has taken the position that Utah law permits disclosure of only "standard voter data," which excludes each voter's year of birth, and that Utah law—as amended by Senate Bill 153 (2026)—prohibits VRF from publishing the list online.

16. The Lieutenant Governor's justifications for restricting access to the statewide voter list are two state-law restrictions: (a) the withholding of each voter's year of birth, on the theory that only "standard voter data" (which Utah defines to include a voter's "age range" but not year or date of birth) may be disclosed, *see* Utah Code Ann. §§ 20A-2-601(1), (14), 20A-2-603(1); *see also id.* § 63G-2-302(1)(j)(i)(D); and (b) the prohibition, enacted by Senate Bill 153 (2026), on "knowingly post[ing] on the internet or otherwise disclos[ing] to the public . . . the list of registered voters or information obtained from the list of registered voters," Utah Code Ann. § 20A-2-607(4)(c) (the "Internet Sharing Ban").

17. Because the records VRF requested must be made public under the Public Disclosure Provision, the Lieutenant Governor violated the NVRA by failing to provide those records to VRF. *See* Count I, NVRA Violation.

18. And, as VRF notified the Lieutenant Governor, the NVRA preempts any state law that impermissibly impedes the implementation and objectives of the NVRA, including any state law that narrows or eliminates the access rights conferred by the Public Disclosure Provision, or prohibits the dissemination of records that must be made available. *See* Count II, NVRA Preemption.

19. VRF repeatedly provided notice that both the refusal to produce the records and the prohibition on publishing those records online violated the NVRA.

20. The Lieutenant Governor did not cure (and has not cured) the violations identified in VRF's Notices of Violation.

21. For similar reasons, the Internet Sharing Ban violates VRF's First Amendment rights by prohibiting political speech regarding Utah's administration of its elections. *See* Count III, First Amendment Violation.

22. VRF sues the Lieutenant Governor in her official capacity to obtain declaratory and injunctive relief vindicating its federal statutory right to access, and its federal statutory and constitutional rights to share, the Utah statewide voter list. *See* Counts I–IV.

**JURISDICTION AND VENUE**

23. The Court has subject matter jurisdiction over this case, and authority to grant the relief requested, pursuant to each of the following:

a. 52 U.S.C. § 20510(b), as VRF is an "aggrieved person," and this action seeks to redress violations of the NVRA;

b. 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States;

c. 28 U.S.C. § 2201(a), in that it seeks to secure declaratory relief; and,

d. 28 U.S.C. § 2202, in that it seeks to secure permanent injunctive relief.

24. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) in that the Lieutenant Governor is situated within this judicial district and a substantial part of the events or omissions giving rise to VRF's claims occurred in this judicial district.

## PARTIES

25. VRF is a nonpartisan Ohio nonprofit limited liability company and affiliate of Restoration of America, a 501(c)(4) social welfare organization. VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America. VRF's mission is to provide public access to official government data pertaining to elections, including voter registration rolls, and to provide thorough, and sometimes critical, analyses of state voter list maintenance efforts. The public dissemination of this information is intended to make the state's election processes more transparent, increase confidence in those processes, and increase voter participation. Analyses of aggregate state voter data can help identify processes to better maintain the accuracy and currency of state voter rolls. A close review of individual voter data can show that it is wrong or was entered incorrectly. VRF encourages users of its Website who identify errors in individual voter data to report these errors directly to the appropriate government official.

26. Defendant Deidre Henderson is the Lieutenant Governor of Utah and is Utah's chief election official under the NVRA. *See* 52 U.S.C. § 20509; Utah Code Ann. § 20A-1-105(1)(a).

27. As the NVRA chief election official, the Lieutenant Governor is "responsible for coordination of State responsibilities under" the NVRA, 52 U.S.C. § 20509. *See also* Utah Code Ann. § 20A-1-105(1)–(2).

28. Lieutenant Governor Henderson is named in her official capacity only.

## BACKGROUND FACTS

### A. The National Voter Registration Act requires states to make voter records publicly available, including the state's official statewide voter list.

29. The NVRA was enacted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance[ ] the participation of eligible citizens as voters in elections for Federal office," 52 U.S.C. § 20501(b)(2); "to protect the integrity of the electoral process," 52 U.S.C. § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4).

30. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of the death or change in residence of the registrant. 52 U.S.C. § 20507(a)(4)(A)–(B).

31. The NVRA mandates transparency in these processes by requiring states to "maintain for at least 2 years and . . . make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject only to two narrow exceptions not relevant here. 52 U.S.C. § 20507(i)(1).

32. The official statewide voter registration list is a "record" that must be made available under the NVRA's Public Disclosure Provision. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024).

33. The NVRA provides a private right of action to any person "aggrieved" by a violation of the NVRA, 52 U.S.C. § 20510(b), including a party whose request for records under the Public Disclosure Provision is refused or denied.

**B. VRF analyzes and shares voter data made available under the NVRA on its Website.**

34. VRF maintains two related but distinct projects. The first is accomplished in-house: VRF's election professionals compare the number of ballots cast in a particular election to the number of voters credited with having voted in that election, as reported in a state's voter list, and, where discrepancies appear, contact state election officials and publish an "audit trail" so that citizens can understand how and why voter registrations are added to or removed from the list.

35. Second, VRF operates its Website to provide public access to official government data pertaining to elections, including the voter registration rolls it obtains from the states. VRF maps the raw data into a searchable, understandable format and makes it available to the public—to users who first agree to VRF's terms of service—so that they may review the voter lists, identify and report errors to the appropriate officials, and engage in political speech concerning the accuracy and maintenance of the voter lists.

36. Once VRF obtains the Utah voter lists, it intends to use the data to ensure the accuracy, currency, and integrity of Utah's voter lists, just as it has done for dozens of other states.

37. VRF further intends to publish the Utah voter lists on its Website so interested citizens can review the information and help identify and report inaccuracies or inconsistencies. Interested citizens can also use the Website to ensure that they are properly registered to vote.

38. VRF does not seek, and does not publish, voters' Social Security numbers, driver's license numbers, telephone numbers, or email addresses, even if a state makes them available.

39. VRF currently has voter data for 35 states and the District of Columbia posted on the Website, and desires to access, post, and analyze Utah voter records so that the public may become and remain informed regarding Utah elections and voter registration rolls.

40. VRF desires to perform its projects and carry out its mission with respect to Utah but is unable to because the Lieutenant Governor (1) refuses to provide it with Utah voter records and (2) insists that even if VRF did obtain the records, sharing them with others online would violate state law. But for the Lieutenant Governor's refusal and the threatened enforcement of Utah law against it, VRF would obtain the Utah voter records, conduct and publish its discrepancy analysis, and publish Utah's statewide voter list on the Website, as it has done for other states.

### C. Federal and state law require Utah to implement programs and activities conducted for the purpose of ensuring the accuracy and currency of its official list of eligible voters.

41. HAVA requires Utah to maintain a "single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). HAVA further requires Utah's system to ensure that voter registration records are accurate and are updated regularly, and to perform regular list maintenance. 52 U.S.C. § 21083(a)(4).

42. Utah law likewise mandates programs and activities to ensure that voter registration records are accurate and current. Utah law requires the Lieutenant Governor to update the statewide voter registration database at least weekly with death records and change-of-address information, to establish matching criteria for identifying changes in the database, and to compare the database at least monthly to identify duplicate and contradictory data. *See* Utah Code Ann. § 20A-2-502(1)(b)(i)–(ii), (d), (e)(i). County clerks must run a duplicate voter utility at least monthly, *id.* § 20A-2-503(4)(a), and must certify to the Lieutenant Governor each month that they have run the required list-maintenance utilities, Utah Admin. Code r. R623-10-8(3)(a). To identify and remove deceased voters, Utah law requires the state registrar to send the Lieutenant Governor each decedent's date of birth. Utah Code Ann. § 26B-8-114(11)(a). The Lieutenant Governor's Office has described these efforts as Utah's "robust program for maintaining our voter rolls," which is "certified to by our county clerks on a monthly basis." Ex. B.

43. Because these programs and activities are undertaken to maintain the official statewide voter list, the list itself necessarily constitutes a record of those programs and activities. Utah's own records statute tracks the NVRA: it defines a "voter registration record" as "a record concerning the implementation of programs and activities conducted for the purpose of ensuring that the official register is accurate and current," and it requires the Lieutenant Governor and each county clerk to preserve "the official register" for at least two years. Utah Code Ann. § 20A-2-506(1)(a), (2)(a)(i).

**D. Utah impermissibly restricts access to its voter registration list in contravention of the NVRA.**

44. Utah maintains a statewide voter registration list as required by HAVA.

45. Subject to various restrictions and conditions, Utah makes the statewide voter list available to requestors that agree to the terms of the Utah Voter Registration/Election Data request form and Utah law.

46. The NVRA's Public Disclosure Provision requires covered "records" to be made "available for public inspection."

47. However, both Utah law and the request form limit access to that list beyond what is permitted by the NVRA, including by failing to provide year of birth information and refusing to provide records to requestors unless they agree not to further disseminate those records to others, particularly online.

48. Permitting such a limitation would frustrate the broad purpose of the NVRA's Public Disclosure Provision.

49. Because the statewide voter list is a "record" that must be made publicly available under the Public Disclosure Provision, Utah cannot rely on state law to avoid its federal disclosure obligations.

50. Thus, Utah's restriction on public access is preempted insofar as it prohibits members of the public from accessing covered records.

### E. The statewide voter list and its contents are "records" which must be made available under the Public Disclosure Provision.

51. In *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025), the Tenth Circuit addressed whether a State may, consistent with the NVRA's Public Disclosure Provision, restrict access to and use of its statewide voter list. VRF had requested New Mexico's

statewide voter list and associated voting-history data, and the State relied on state-law use restrictions and a data-sharing ban to limit how VRF could obtain, use, and share that information.

52. The Tenth Circuit affirmed that those restrictions are preempted by the NVRA and, in doing so, held that the statewide voter list is a "record" that must be made available for public inspection under 52 U.S.C. § 20507(i)(1). *Torrez*, 160 F.4th at 1084–88.

53. Beginning with the statutory text, the court held that because the NVRA does not define "records," the term should have its ordinary meaning from the time of enactment. *Id.* at 1085 (interpreting "records" to mean "knowledge or information that is preserved by being put into written form—whether penned or not"). The court rejected the contention that "records" means only physical documents, holding that the statute does not restrict records "from being 'recorded' on a medium like on a computer or an electronic database." *Id.*

54. The court likewise rejected the argument that dynamic, electronically maintained data cannot be "records." *Id.* Because the Public Disclosure Provision directs States to "maintain" the records, the data must be "consistently and constantly updated—i.e., be dynamic—to 'ensure that accurate and current voter registration rolls are maintained.'" *Id.* (quoting § 20501(b)). And the court held that extracting a report from a statewide voter database in response to a request is not the creation of a new record outside the disclosure duty. *Id.* at 1086.

55. The court further held that voters' names and addresses are not excluded from the records that must be disclosed. Subsection (i)(1) requires "all" relevant records and carves out only two exceptions—records relating to "a declination to register to vote" or to "the identity of a voter registration agency." *Torrez*, 160 F.4th at 1087 (quoting 52 U.S.C. § 20507(i)(1)). A State may redact uniquely or highly sensitive personal information before producing voter data, but

"restricting uses and/or publication altogether is prohibited by the NVRA." *Torrez*, 160 F.4th at 1083 n.14.

56. Because the NVRA "encourages broad and extensive public disclosure of relevant records without restrictions on who provides it," the Tenth Circuit held that state-law restrictions limiting access to voter data are preempted. *Torrez*, 160 F.4th at 1083.

57. Thus, pursuant to binding Tenth Circuit precedent, the NVRA preempts state laws that purport to prevent public disclosure of a state's voter registration list.

58. As the First Circuit has likewise recognized, public inspection of the underlying voter data—including the statewide voter list—is necessary for the public to identify, address, and fix irregularities in States' voter rolls. *See Pub. Int. Legal Found., Inc.*, 92 F.4th at 54.

**F. VRF first requested Utah voter records on February 19, 2026.**

59. On February 19, 2026, VRF sent (via FedEx) its first request to the Lieutenant Governor seeking three categories of voter records under the NVRA's Public Disclosure Provision.

60. The categories of requested records included: (1) a copy of Utah's official statewide public and private voter lists, including each voter's year of birth but omitting any voter's Social Security number, driver's license number, telephone number, and email address; (2) voter registration data for all voters removed or canceled from any voter list between February 19, 2024 and the present; and (3) voting history/credit data for each voter who voted in the November 8, 2022 and/or November 5, 2024 general elections, including the method of voting and the voting jurisdiction (together, the "Requested Records").

61. In its February 19, 2026 request, VRF explained that it intended to use the Requested Records for two purposes: first, to publish Utah's official statewide voter list on

VoteRef.com so that citizens who agree to VRF's terms of service may review the data and report any errors to the relevant election authority; and second, to analyze the records to conduct a discrepancy review of Utah's voter rolls, to publish that analysis (without posting any individual voter's personal information alongside it), and to engage the Lieutenant Governor's Office in dialogue regarding its list-maintenance efforts.

62. VRF's request cited the NVRA's Public Disclosure Provision as the basis for the request.

63. The request also objected to the Lieutenant Governor's Office's prior position that Requested Records could be used only by the requester and could not be shared with others.

64. A true and correct copy of the February 19, 2026, request from VRF to the Lieutenant Governor is attached as **Exhibit A** and is incorporated by reference.

65. On March 3, 2026, Madi Topik, a Legal and Policy Analyst in the Lieutenant Governor's Office, acknowledged receipt of the request and asserted that the NVRA afforded the Lieutenant Governor's Office 90 days to respond.

66. On March 26, 2026, Topik sent a substantive response to VRF on behalf of the Lieutenant Governor's Office.

67. As to part (1) of VRF's request, Topik stated that a list of Utah voters could be obtained by submitting a request through the Office's Voter Registration Election Data page.

68. Topik also wrote that Senate Bill 153, passed during the 2026 legislative session, "changes the information available to the public beginning on May 25, 2026."

69. As to part (2) of VRF's request, Topik directed VRF to the Office's NVRA Data page.

70. As to part (3) of the Request, Topik asserted that vote history "is not an activity related to voter list maintenance and therefore not producible under NVRA," that the 2022 election fell outside the NVRA's two-year record-retention period, and that vote history was available as part of the voter list referenced in part (1) of the request.

71. The March 26, 2026, response asserted that "Utah is in compliance with the NVRA and the requirements for publicly available information and inspection of such information."

72. The March 26, 2026, response did not dispute that the statewide voter list is a "record" which must be made available under the NVRA.

73. A true and correct copy of the March 3 and March 26, 2026, responses from Ms. Topik to VRF is attached as **Exhibit B** and is incorporated by reference.

### G. VRF sends its first NVRA Notice of Violation to the Lieutenant Governor for failing to produce the Requested Records.

74. Before an injured party may file suit for a violation of the NVRA, it must "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. § 20510(b)(1).

75. On April 3, 2026, VRF, through counsel, sent the Lieutenant Governor a Notice of Violation of the NVRA.

76. The Notice of Violation restated and attached VRF's February 19, 2026, request and quoted the March 3 and March 26 responses.

77. The Notice of Violation identified Utah's violations of the NVRA's Public Disclosure Provision, including: (1) failing to produce the records requested on February 19, 2026, (2) imposing access requirements that are not found in, and conflict with, the NVRA, and (3) the

imposition of an Internet Sharing Ban under the recently passed and enacted Senate Bill 153, Utah Code Ann. § 20A-2-607.

78. The Notice of Violation noted the interesting timing of Utah's passage of an Internet Sharing Ban, as just four months before its passage, the Tenth Circuit had held that the NVRA preempts state attempts to criminalize the sharing of its statewide voter list, including by publishing it on the Internet, citing *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025).

79. The Notice of Violation demanded that Utah cure these violations by (a) producing the requested records within 20 days of receipt, and (b) confirming in writing that the Internet Sharing Ban would not be enforced against VRF in light of *Torrez*.

80. A true and correct copy of the April 3, 2026, Notice of Violation is attached as **Exhibit C** and is incorporated by reference.

81. The Lieutenant Governor responded, again through Topik, on May 1, 2026.

82. Ms. Topik confirmed receipt of the April 3, 2026, Notice of Violation.

83. Ms. Topik then contended that the list of voters the state had offered to produce satisfied the NVRA, and that the NVRA permits a state to require a standardized request form and a fee.

84. Topik also noted that beginning May 25, 2026, Utah law would change pursuant to SB 153, and the voter list provided to requestors would include additional information on all voters except those reclassified as "at-risk."

85. Topik also noted that SB 153 was now the law of the state and that neither the Lieutenant Governor's Office nor the recipient of a Utah voter list has "the latitude or authority to waive statutory requirements or otherwise disregard state law."

86. A true and correct copy of the May 1, 2026, correspondence from the Lieutenant Governor to VRF is attached as **Exhibit D** and is incorporated by reference.

87. Upon receiving that response, VRF decided to wait until May 25, 2026—when, under SB 153's transition provision, updated voter records would again become available—to renew its request for voter records. *See* Utah Code Ann. § 20A-2-607(2).

**H. VRF renews its NVRA Request after changes to Utah state law go into effect on May 25, 2026.**

88. On June 2, 2026, VRF, through counsel, sent a renewed NVRA Request and Notice of Violation.

89. VRF renewed its February 19, 2026, Request in light of the changes to Utah law, and explained that the Lieutenant Governor's responses had made clear her intent to enforce the Internet Sharing Ban, which violates the NVRA.

90. The June 2, 2026, Notice of Violation further identified the State's refusal to provide each voter's year of birth—providing instead only a generic "age range"—as a separate and ongoing violation of the Public Disclosure Provision.

91. The June 2, 2026, Notice of Violation also detailed how the Internet Sharing Ban and the request-form acknowledgements unlawfully burden VRF's federally protected access to and sharing of the records.

92. VRF stated that it stood ready and willing to pay the applicable fee, demanded cure within 20 days by (a) producing the Requested Records, including year-of-birth information, and

(b) confirming in writing that the Internet Sharing Ban would not be enforced against VRF, and advised that it would pursue legal action absent cure.

93. A true and correct copy of the June 2, 2026, Request and Notice of Violation is attached as **Exhibit E** and is incorporated by reference.

### I. The Lieutenant Governor reaffirms that she will not produce the Requested Records and that, even if she did, the Internet Sharing Ban would be enforced against VRF.

94. On June 19, 2026, Topik responded on behalf of the Lieutenant Governor.

95. Topik asserted that Utah Code Ann. § 20A-2-607 “expressly prohibits the posting of the statewide voter list or associated information on the internet”; that, under Utah Code Ann. § 20A-2-603, only “standard voter data” (which she enumerated to include a voter’s “age range” and vote history, but not year of birth) may be disclosed.

96. Topik further stated that the Office is “prohibited from sharing information that is not standard voter data, such as the year of birth”; and that the Lieutenant Governor lacks authority to waive the statutory sharing ban.

97. She stated that the Office was “ready and willing to provide the statewide voter list in compliance with both state and federal law,” but could not provide non-standard data “with the knowledge that VRF intends to publish the voter list in violation of Utah law.”

98. A true and correct copy of the June 19, 2026, response is attached as **Exhibit F** and incorporated by reference.

99. The Lieutenant Governor did not produce the Requested Records, did not provide year-of-birth information, and did not confirm that the Internet Sharing Ban would not be enforced against VRF.

100. On June 25, 2026, VRF, through counsel, replied with a further NVRA Request and Notice of Violation.

101. VRF reiterated that it is entitled to year-of-birth information under 52 U.S.C. § 20507(i), and that providing only a manipulated "age range" different from the year of birth that Utah actually maintains violates the NVRA.

102. VRF further explained that the Internet Sharing Ban violates both the NVRA and the First Amendment and defies the Tenth Circuit's binding decision in *Torrez*.

103. VRF stated that it would submit a request for the statewide voter list through the State's online portal and pay the required fee, but that—because Utah refused to confirm that the Internet Sharing Ban would not be enforced against it—VRF intended to file suit challenging the Internet Sharing Ban and the State's continued withholding of year-of-birth information.

104. VRF confirmed that it would not publish the statewide voter list on VoteRef.com unless and until it obtained a court order permitting it to do so, and that submitting the required form and paying the fees would not waive any of its rights.

105. A true and correct copy of the June 25, 2026, Notice of Violation is attached as **Exhibit G** and is incorporated by reference.

106. On June 26, 2026, the Lieutenant Governor's Office advised VRF that it would need to complete a new request form to obtain the data.

107. A true and correct copy of the June 26, 2026, email is attached as **Exhibit H** and is incorporated by reference.

108. VRF had submitted its request through the Office's online portal earlier that day; in response, the Office required VRF to complete the updated Voter Registration Information Request form attached to the June 26 email.

109. The updated Voter Registration Information Request form requires a requester to check ten "acknowledgements" and to "swear/affirm that the information I provide in this request is true and correct," including acknowledgements that the requester "will not provide or use the information obtained from the list of registered voters in a manner that is prohibited by law," that "obtaining the requested information under false pretenses, or providing or using the information in a manner that is prohibited by law, is punishable as a class A misdemeanor and by a civil fine," and that "a person making a false statement on this request form is punishable by law under Utah Code § 76-8-504." The Office's online request form likewise required a requester to acknowledge that misuse of a voter's year of birth is a class A misdemeanor subject to "a civil fine which may reach or exceed $48,000." *See* Ex. E at 3.

110. A true and correct copy of the request form is included as an attachment to **Exhibit H** and is incorporated by reference.

111. VRF cannot truthfully make the attestations the form requires—because it intends to exercise its federally protected right to publish the statewide voter list online—and will not do so under threat of criminal and civil penalty. As a result, VRF has refrained from obtaining and publishing Utah's statewide voter list, and will continue to refrain from doing so, solely because of the threatened criminal and civil penalties under Utah law.

112. The effect of the State's access restrictions, including the Internet Sharing Ban and the acknowledgements required on the request form, is that VRF can never obtain and use the statewide voter list to which it is entitled under the NVRA.

113. On July 10, 2026, VRF, through counsel, sent a final NVRA Notice of Violation.

114. VRF stated that it had attempted to request Utah's voter list through the only process the Lieutenant Governor's Office had identified, and had committed to pay the required fees and to refrain from posting the information online absent a court order.

115. VRF further stated that, when it attempted to make the request, the Office required it to agree to ten "acknowledgements" made under penalty of perjury, several of which impose restrictions that violate the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i), and would prevent VRF from exercising its federal rights to obtain, use, and publish the records.

116. A true and correct copy of the July 10, 2026, Notice of Violation is attached as **Exhibit I** and incorporated by reference.

117. The Lieutenant Governor has not produced and will not produce the Requested Records.

118. The Lieutenant Governor has not produced and will not produce the requested year-of-birth information.

119. The Lieutenant Governor insists that the Internet Sharing Ban will and must be enforced against VRF if it publishes the Utah list online. The Lieutenant Governor has not disavowed enforcement of the Internet Sharing Ban against VRF; to the contrary, her Office has told VRF that she lacks authority to waive it. As Utah's chief election officer, the Lieutenant Governor is responsible to oversee, and generally supervise, all elections and functions relating to

elections in the state, including requests for voter registration records. *See* Utah Code Ann. § 20A-1-105(1)(b). The Internet Sharing Ban was enacted in 2026, has not been repealed or enjoined, and on its face prohibits the very publication VRF intends. Utah law also requires that, before the Lieutenant Governor releases voter data, the requester sign a request form promising not to provide or use the information in a manner prohibited by law, Utah Code Ann. § 20A-2-603(3)(b)(iv)–(vi), and it directs her to withhold voter registration records from a requester she has probable cause to believe will use or share them in a manner prohibited by law, *id.* § 20A-2-603(3)(c)(iii). She has invoked that authority to withhold records from VRF because of its stated intent to publish the list online. *See* ¶ 97.

120. The applicable cure period under 52 U.S.C. § 20510(b) elapsed without cure by the Lieutenant Governor. More than 90 days elapsed after the Lieutenant Governor received each of VRF's Notices of Violation, including the final Notice of Violation sent on July 10, 2026, before VRF filed this action. *See* 52 U.S.C. § 20510(b)(2).

121. By sending its Notices of Violation and providing the requisite cure period before bringing suit, VRF fully complied with the NVRA's pre-suit notice requirements before filing this Complaint.

**<u>COUNT I</u>**
**VIOLATION OF THE NVRA**
**PUBLIC DISCLOSURE PROVISION**
**(52 U.S.C. § 20507(i))**

122. VRF restates and realleges the allegations in Paragraphs 1 through 121 as if fully restated herein.

123. On February 19, 2026, VRF requested the Requested Records from the Lieutenant Governor under the Public Disclosure Provision. *See* **Exhibit A**.

124. VRF renewed that request on June 2, 2026. *See* **Exhibit E**.

125. The Requested Records—including Utah's official statewide voter list and each voter's year of birth—are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" within the meaning of 52 U.S.C. § 20507(i)(1), and are in the possession, custody, and control of the Lieutenant Governor.

126. The Lieutenant Governor failed and refused to provide the Requested Records in response to VRF's requests, including by withholding each voter's year of birth and providing instead only a generic "age range," and by conditioning access on acknowledgements and restrictions not found in, and conflicting with, the NVRA.

127. By failing and refusing to provide the Requested Records to VRF, the Lieutenant Governor has violated the NVRA's Public Disclosure Provision.

128. VRF is harmed by the Lieutenant Governor's refusal because it is being unlawfully refused access to voter data that is essential to the core projects for which it exists, and it has no adequate remedy at law. Without the Requested Records, VRF cannot conduct or publish its discrepancy analysis of Utah's voter rolls, cannot engage the Lieutenant Governor's Office regarding any discrepancies it identifies, and cannot publish Utah's voter list on the Website—concrete harms to VRF's own activities that exist independent of this litigation. Additionally, without specific year of birth information, VRF and users of its Website cannot adequately identify and report errors in specific voters' records, as it is impossible to verify a voter's information without year of birth information.

129. VRF is an aggrieved person under 52 U.S.C. § 20510(b) and has complied with all pre-suit notice requirements under the NVRA.

**COUNT II**
**PREEMPTION OF THE INTERNET SHARING BAN**
**BY THE NATIONAL VOTER REGISTRATION ACT**
**(52 U.S.C. § 20507(i))**

130. VRF restates and realleges the allegations in Paragraphs 1 through 129 as if fully restated herein.

131. The NVRA's Public Disclosure Provision requires each state to "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," and confers rights on members of the public to request and obtain those records. 52 U.S.C. § 20507(i)(1).

132. "Records," as used in the Public Disclosure Provision, includes individual and identifiable voter information maintained in statewide voter lists. *Torrez*, 160 F.4th at 1087–88.

133. The NVRA specifically requires states to make reasonable efforts to maintain the accuracy of voter rolls, 52 U.S.C. § 20507(a)(4), and the records reflecting or related to this maintenance function must be made available for public inspection.

134. Congress expressly stated that the NVRA has four objectives: to increase the number of eligible citizens who register to vote, to enhance the participation of eligible citizens as voters, to protect the integrity of the electoral process, and to ensure that accurate and current voter registration rolls are maintained. 52 U.S.C. § 20501(b).

135. Because the NVRA is Elections Clause legislation, there is no presumption against preemption, and a state law is preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Torrez*, 160 F.4th at 1080–81.

136. Utah law, Utah Code Ann. § 20A-2-607(4)(c), (5), makes it a class A misdemeanor to "knowingly post on the internet or otherwise disclose to the public, for a fee or free of charge, the list of registered voters or information obtained from the list of registered voters."

137. The Internet Sharing Ban is preempted by the NVRA because it prohibits members of the public, including VRF, from sharing and publishing records that the NVRA is designed to make publicly available, and because—through the acknowledgements Utah requires on its request form—it also prevents VRF from obtaining the statewide voter list in the first place.

138. The Internet Sharing Ban contradicts Congress's stated objectives and creates obstacles to the NVRA's implementation. The Tenth Circuit has already held that the NVRA preempts a state's attempt to criminalize the sharing of its statewide voter list, including by publishing it on the Internet. *Torrez*, 160 F.4th at 1083–84.

139. VRF is harmed by the Internet Sharing Ban because it is being unlawfully prevented from obtaining, using, and publishing the Requested Records that are essential to the core projects for which it exists and to which it has a right under federal law.

140. VRF is further harmed because the Internet Sharing Ban prevents VRF from engaging in speech and association with other citizens concerning voter roll maintenance.

141. The Internet Sharing Ban is therefore preempted by the NVRA and is invalid and unenforceable to the extent it bars requestors like VRF from sharing, publishing, or obtaining the Requested Records.

142. VRF is an aggrieved person under 52 U.S.C. § 20510(b) and has complied with all pre-suit notice requirements under the NVRA.

**COUNT III**
**VIOLATION OF THE FIRST AMENDMENT**
**(42 U.S.C. § 1983)**

143. VRF restates and realleges the allegations in Paragraphs 1 through 142 as if fully restated herein.

144. The First Amendment to the United States Constitution commands, "Congress shall make no law . . . abridging the freedom of speech," and the speech protections of the First Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Stromberg v. California*, 283 U.S. 359, 368 (1931).

145. "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). "[S]peech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

146. The NVRA requires the state of Utah to make its voter data available, especially for the types of speech engaged in by VRF and VRF's associates who engage with VRF through its Website.

147. Because federal law requires that the data be made available, the First Amendment protects recipients of that data when they engage in speech and association by using and sharing the data, as the creation and dissemination of information are speech within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001)) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."). Unlike information a State may choose to withhold altogether, the statewide voter list is a record that federal law requires Utah to make available, so Utah may not condition VRF's access to it on VRF's agreement not to share it. *See Torrez*, 160 F.4th at 1083 n.14.

148. The First Amendment protects speech over the internet as well as by means of communication devices used prior to the high-tech era. *Reno v. ACLU*, 521 U.S. 844, 870 (1997).

149. A state may violate the protections of the First Amendment in many ways, *e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), but a law imposing penalties on protected speech is a stark example of speech suppression.

150. VRF's sharing of Utah voter records with individuals who associate with VRF by accessing the data on VRF's website is constitutionally protected speech.

151. In addition to sharing the records themselves, VRF's Website includes commentary regarding how ordinary citizens can use and review the data. The Website also includes a call to action for citizens to contact state officers charged with maintaining the voter rolls if issues were identified.

152. The Website itself, including the voter records on the Website, is core political speech.

153. Even if the Website were not itself core political speech, the State's complete ban on sharing voter data would silence core political speech by banning the sharing of the underlying records necessary to effectively engage in that speech.

154. Speech sharing information about the voting history of Utah voters (that is, information that the NVRA already requires, and that Utah already legally allows, to be produced to requesters), particularly when used in the manner contemplated by Plaintiff, sits at the zenith of First Amendment protection. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest.

155. The Internet Sharing Ban is a direct restriction on this constitutionally protected, core political speech and cannot stand unless it survives strict scrutiny.

156. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. . . . Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340 (internal quotation marks and citations omitted).

157. "As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a

constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.* at 340–41.

158. The Internet Sharing Ban makes it more difficult, more expensive, and essentially impossible for VRF to disseminate meaningful information regarding Utah's administration of its elections.

159. Due to the volume of voter information VRF wishes to share—including data on millions of voters—it is virtually impossible to distribute through any other non-Internet means. Further, it is the very accessibility of the data on the Internet that will draw interested listeners and political associates to VRF's speech, and that will motivate them to engage in their own speech.

160. Having the data accessible on the Internet also sends its own message: that this is the public's data, and that it is and should be transparent. VRF hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF's plan is to crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data.

161. In criminalizing the dissemination of these voter records, the Internet Sharing Ban does not leave open ample, comparable, and effective alternative channels for communication.

162. The Internet Sharing Ban also infringes on and abridges VRF's speech by limiting the size of the audience that can be reached.

163. For the reasons stated above and herein, the Internet Sharing Ban violates VRF's First Amendment rights, including its rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of Utah through the Fourteenth Amendment.

164. As a result of the Internet Sharing Ban, VRF is suffering and will continue to suffer irreparable harm, including through the chilling of its First Amendment protected speech.

165. The Internet Sharing Ban is enforced under the color and pretense of state law and VRF seeks to enjoin the Lieutenant Governor, who as an agent of the State of Utah claims to be statutorily obligated to enforce the Internet Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of VRF's rights. 42 U.S.C. § 1983.

## COUNT IV
## DECLARATORY JUDGMENT
## (28 U.S.C. §§ 2201–2202)

166. VRF restates and realleges the allegations in Paragraphs 1 through 165 as if fully restated herein.

167. An actual and justiciable controversy exists between VRF and the Lieutenant Governor concerning whether the Requested Records, including each voter's year of birth, must be disclosed under the Public Disclosure Provision, and whether the Internet Sharing Ban and Utah's withholding of year-of-birth information are preempted to the extent they bar VRF's access to, and publication of, the records.

168. For the reasons stated above, VRF is entitled to relief declaring that the Requested Records, including Utah's official statewide voter list and each voter's year of birth, are "records" which must be made publicly available under the Public Disclosure Provision.

169. For the reasons stated above, VRF is entitled to relief declaring that the Internet Sharing Ban, Utah Code Ann. § 20A-2-607(4)(c), on its face and as applied to VRF, unlawfully restricts the objectives of the NVRA and is preempted.

170. In order to prevent further violation of VRF's federal statutory rights by the Lieutenant Governor, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the Internet Sharing Ban to be preempted by the NVRA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for judgment in its favor and against Defendant, and that the Court:

a. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Requested Records, including Utah's official statewide voter list, are "records" which must be made publicly available under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i);

b. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Lieutenant Governor must make voters' year of birth information available under the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i);

c. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Internet Sharing Ban is preempted by the Public Disclosure Provision of the NVRA

and is invalid to the extent it prohibits requestors, including VRF, from sharing records via the Internet that must be made available under the NVRA's Public Disclosure Provision;

d. Pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Internet Sharing Ban violates the First Amendment to the United States Constitution and is invalid to the extent it prohibits requestors, including VRF, from sharing records via the Internet that must be made available under the NVRA's Public Disclosure Provision;

e. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, permanently enjoin the Lieutenant Governor, her officers, agents, employees, and all persons acting in active concert or participation with them, from enforcing the Internet Sharing Ban against VRF, including by withholding voter records from VRF, or conditioning VRF's access to them, because VRF intends to publish them;

f. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, enjoin the Lieutenant Governor to produce the Requested Records to VRF in electronic format including year of birth information, while omitting any voter's Social Security number, driver's license number, telephone number, and email address;

g. Pursuant to 52 U.S.C. § 20510(c), 42 U.S.C. § 1988(b), and other applicable law, award VRF its costs and expenses incurred in bringing this action, including its reasonable attorneys' fees; and,

h. Grant all other and further relief that the Court deems equitable, just, and proper.

Dated: November 6, 2026

Respectfully submitted,

**FRAZIER LAW, PLLC**

By: */s/ Dallin B. Holt*
Dallin B. Holt (Utah Bar No. 18210)
222 S. Main Street, 5th Floor
Salt Lake City, Utah 84101
dholt@frazierlawpllc.net
Tel: (480) 691-0975

Phillip M. Gordon (TX 26096085)*
111 Congress Ave., Ste. 500
Austin, TX 78704
pgordon@frazierlawpllc.net
(512) 375-3129

**GRAVES GARRETT GREIM LLC**
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
Sarah R. Pineau (MO 74483)*
**Motion for Pro Hac Vice Admission Forthcoming*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
spineau@gravesgarrett.com

*Attorneys for Plaintiff Voter Reference Foundation, LLC*